CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 01 2005

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| RICKY E. HALE,<br>Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:04cv00053 |
| KEMPER NATIONAL SERVICES,<br>INC., et al.<br>Defendants. | ) ) ) ) ) ) | **MEMORANDUM OPINION** |
| | | By:  GLEN M. WILLIAMS,<br>Senior United States District Judge |

Plaintiff, Ricky E. Hale, ("Hale"), filed this action challenging the final decision of defendants denying Hale's claim for long-term disability, ("LTD"), benefits under a plan governed by the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001, *et seq.* Jurisdiction of this court is pursuant to 29 U.S.C.A. § 1132(f) (West 2003).

### I. Background and Facts

Hale was employed by American Electric Power, ("AEP"), as a maintenance mechanic from May 17, 1989, until September 3, 2000. (Record, ("R."), at 9.) Hale participated in AEP's employee welfare benefit plan, ("the Plan"), which was insured by AEP, administered through defendant Broadspire Services, ("Broadspire") (formerly Kemper National Services), and governed by ERISA. (R. at 313, 332-33, 377.) The Plan provides certain benefits in the event of disability upon receipt of

-1-

proof that a participant is disabled. (R. at 377-79.) The Plan provides that "total disability" means that due to an accidental bodily injury, sickness or mental illness, a participant is prevented from performing the essential duties of his occupation. (R. at 318.) After 24 months of total disability, a participant is eligible for continued LTD benefits if he is "prevented from performing the essential duties of any occupation for which [he] is qualified by education, training, or experience." (R. at 318, 378.) LTD benefits are 60 percent of an employee's base monthly income. (R. at 377-79.) In order to receive benefits, the plan states that the participant must be under the regular and continuing care of a doctor who is not a member of his immediate family. (R. at 384.) To continue receiving benefits, a participant is required to provide continuing proof of disability at least once a year. (R. at 384.)

In delineating the Plan administrators' authority, the Plan provides Broadspire with the authority to review and process initial benefit determinations and first-level appeals, while it vests the authority to administer second-level appeals to the AEP Long-Term Disability Plan Claims Appeal Committee, ("Appeal Committee"). (R. at 395-96.) If a participant is dissatisfied with the initial benefit determination, he may informally contact Broadspire to review his claim, or he may immediately pursue a first-level appeal. (R. at 395-96.) The review of first-level appeals affords no deference to the initial benefit determination and is conducted by someone other than an individual involved in the initial benefit determination or a subordinate of such an individual. (R. at 396.) If a claim is denied based on a medical judgment, Broadspire will consult a health professional with appropriate training and experience and also identify medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the adverse benefit determination. (R. at 396.) Like first-

-2-

level appeals, the review of second-level appeals affords no deference to the determination of the first-level appeal and is conducted by someone not involved in the review of the first-level appeal. (R. at 396.) If a claim is denied based on a medical judgment, the appeal committee utilizes an independent external review organization with medical professionals generally certified in the speciality of the issue of the appeal. (R. at 397.)

The record shows that Hale filed his application for LTD benefits on or about January 17, 2001, due to a ruptured disc in his lower back, which had required surgery. (R. at 4-5.) Effective March 15, 2001, Broadspire granted Hale LTD benefits. (R. at 44-45.) However, these benefits were discontinued effective September 8, 2002, based on a determination that Hale was not disabled from "any occupation for which [he was] qualified by education, training or experience." (R. at 82-83.) Hale appealed this determination to Broadspire and submitted additional medical information on the loss of his right little finger, but on November 14, 2002, the original termination was upheld in reliance on a general peer review conducted by Dr. James Wallquist, M.D. (R. 173-77, 179-81, 186-87.) Hale then appealed to AEP's Appeal Committee, which utilized a peer review analysis conducted by Dr. Leela Rangaswamy, M.D., dated March 7, 2003, in reaching its decision. (R. at 281-83.) Dr. Rangaswamy concluded that Hale was not totally disabled and based her decision, in part, on Hale's obesity and poor conditioning. (R. at 281.) Dr. Rangaswamy noted, "the medical record [was] characterized by the documentation of subjective complaints of pain that remained constant despite a plethora of medications, physical therapy, injections and surgery." (R. at 281.) Dr. Rangaswamy denied a conflict of interest and indicated that no more than five percent of her

-3-

income was derived from AEP. (R. at 283.) Dr. Rangaswamy conducted another peer review analysis on March 21, 2003, due to the introduction of a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on Hale, dated January 13, 2003. (R. at 289-90.) However, Dr. Rangaswamy determined that there were no objective clinical findings to substantiate the restrictions and let her earlier analysis stand. (R. at 289-90.) The Appeal Committee affirmed the discontinuance of LTD benefits on April 7, 2003. (R. at 278.) Hale then filed this action seeking review of the Appeal Committee's unfavorable decision. The case is now before the court on Hale's motion for summary judgment filed February 14, 2005, (Docket Item No. 20), and defendants' motion for summary judgment filed March 31, 2005. (Docket Item No. 29.)

## II. Facts

Hale visited The Clinic on April 1, 1999, for an evaluation of the loss of his right little finger. (R. at 187.) Dr. Glenn Freeman, M.D., deduced that Hale had a 21 percent functional impairment of his right ring finger and a 100 percent functional impairment of his right little finger from an amputation at the MP joint. (R. at 187.)

On October 25, 1999, Hale had a thyroid ultrasound performed at Stone Mountain Health Services, ("Stone Mountain"). (R. at 195.) The ultrasound showed Hale's thyroid gland was normal and uniform in size and echo texture. (R. at 195.)

Hale returned to Stone Mountain on January 17, 2000, for a follow-up appointment. (R. at 196.) Hale complained of weight gain, although he watched his

diet, intermittent wrist pain and an intermittent burning sensation on his lateral thigh area. (R. at 196.) Another ultrasound on Hale's thyroid showed a normal study. (R. at 196.) Dr. Ranji Basa, M.D., Hale's primary care physician, assessed Hale with hypothryodism, hypertriglyceridemia, wrist pain that could be secondary to mild carpal tunnel syndrome and chronic intermittent low back pain. (R. at 196.) Dr. Basa also continued Hale's use of Prilosec, started Hale on Vioxx and advised Hale to wear a wrist splint at night and to monitor his blood pressure at home. (R. at 196.) A lipid profile was performed that showed Hale's cholesterol at 192 mg/dL and his triglyercides at 377 H mg/dL. (R. at 197.)

On March 4, 2000, Hale visited Stone Mountain with complaints of a persistent burning sensation on the lateral aspect of his left thigh. (R. at 200.) However, Hale denied any weakness or numbness in his legs or any back pain. (R. at 200.) Dr. Basa found no palpable deformities in Hale's back nor any muscle spasms. (R. at 200.) Dr. Basa assessed Hale with paresthesias in the left lateral thigh area, although he considered the possibility of neuralgia paresthesia and could not exclude disc disease or hip bursitis as potential diagnoses. (R. at 200.)

On April 11, 2000, Hale had x-rays of his lumbar spine taken at Bristol Regional Medical Center, ("BRMC"). (R. at 204-05.) The images revealed mild facet hypertrophy at the L3-4 level with subtle narrowing of the transverse diameter of the canal. (R. at 205.) Hale's disc was unremarkable, and his central canal and neural foramina remained patent. (R. at 205.) The L4-5 level demonstrated a central disc protrusion with a small extruded component that was more pronounced than was shown in x-rays taken in 1997. (R. at 205.) There was also associated facet

hypertrophy with subtle narrowing of the transverse diameter of the canal, and the neural foramina demonstrated moderate narrowing bilaterally due, in part, to degenerative facet disease and disc protrusion. (R. at 205.) The x-rays further indicated that at the L5-S1 level, there was a small posterior midline disc protrusion but no extruded components. (R. at 205.)

Hale visited Stone Mountain on April 18, 2000, for a follow-up of his low back pain and associated numbness and radiation of pain towards his left leg. (R. at 203.) Hale underwent a MRI of his lumbar spine, which revealed disc protrusion at the L4-L5 level, which was more pronounced than a MRI performed in 1997. (R. at 203.) The MRI also revealed some mild midline disc protrusion at L5-S1 level. (R. at 203.) Dr. Basa diagnosed Hale with chronic low back pain, and although the exact etiology was unclear, Dr. Basa believed it could be secondary to a bulging disc. (R. at 203.)

Hale had a x-ray taken of his left hip at Abingdon Radiology Services, Ltd., on March 13, 2000, which showed no bony or soft tissue abnormality. (R. at 201.) X-rays also were taken of his hip at Stone Mountain on March 31, 2000, which showed normal results. (R. at 202.)

Upon a referral from Dr. Basa, Hale visited Appalachian Orthopaedic Associates, P.C., on August 22, 2000, for evaluation and treatment of his lower back pain. (35-36.) Hale reported that the pain had started four to five years before as numbness in his left leg but that the pain had gotten progressively worse and traveled into his back and buttocks. (R. at 35.) Hale stated that it was difficult to stand on concrete or to sit on a hard chair. (R. at 35.) Upon examination, Hale had a moderate

Case 1:04-cv-00053-GMW-PMS   Document 43   Filed 12/01/05   Page 6 of 25   Pageid#: 845

degree of spasm in his lumbar area extending to T12. (R. at 247.) Hale also had some trapezial tightness, and his straight leg raise was positive for back pain bilaterally, worse on the left side. (R. at 247.) Dr. William McIlwain, M.D., noted that a lumbar scan demonstrated L4-L5 disc degeneration, protrusion and what appeared to be a free fragment central L4-5 that superimposed on stenosis. (R. at 35.) Dr. McIlawin gave Hale Lortab for pain and discussed treatment options, including surgery. (R. at 36.) Hale underwent a surgical procedure on September 8, 2000, involving a left L3-4, L4-L5 and L5-S1 foraminotomy on the right, right foraminotomy and laminectomy on the right and left, BAK cage fusion and 13-by-24 single oblique with autologous graft for fusion at the L4-L5 level. (R. at 36.)

On September 18, 2000, Hale visited Stone Mountain to have his potassium level checked after receiving a low potassium reading on the day of his surgery. (R. at 207.) The results of a basic metabolic panel showed Hale's potassium at 5.1 mEq/L. (R. at 208.) At this appointment, Hale complained of soreness and pain in his lower back, even though he admitted that he had improvement of his neuropathy and shooting pain. (R. at 207.) Dr. Basa diagnosed Hale with a bulging disc and hypokalemia with exact etiology unclear. (R. at 207.)

On September 27, 2000, Hale visited Appalachian Orthopaedic Associates for a follow-up. (R. at 36-37.) Hale reported that his preoperative pain had subsided but that he still had some low back pain in his operative area. (R. at 36.) Upon examination, Hale's left EHL was four out of five, and his left straight leg raise was positive for back pain at 75 degrees. (R. at 36.) Hale was diagnosed with lumbar disc herniation at the L4-L5 level with left lateral stenosis at the L3-4 and L5-S1 levels.

-7-

(R. at 250.) Hale was prescribed Lortab, Flexeril and Vioxx and given a new lumbar dorset to wear for support. (R. at 37.)

On October 17, 2000, Hale visited Stone Mountain for a follow-up on his recovery since surgery. (R. at 109.) Hale reported that he still had soreness, although it was not as bad as before surgery. (R. at 109.) Hale further stated that the burning sensation in his legs had disappeared since surgery, but he had been experiencing muscle spasms. (R. at 109.) Dr. Basa diagnosed Hale with muscle spasms in his lower back and lower back pain. (R. at 109.) Dr. Basa substituted Soma for Flexeril for Hale's muscle spasms and continued Hale's use of Lortab and Vioxx. (R. at 109.)

On November 1, 2000, Hale returned to Appalachian Orthopaedic Associates complaining of continued lower back pain that was different from his preoperative pain. (R. at 37-38.) Hale also complained of some leg pain with cramping. (R. at 88.) Dr. McIlwain advised Hale to attend physical therapy and to massage his legs. (R. at 38.) Dr. McIlwain opined that Hale was improving and gave Hale Desyrel. (R. at 38.)

On November 29, 2000, Hale visited Appalachian Orthopaedic Associates, reporting that he felt much better but still had constant low back pain with an aching sensation. (R. at 38.) Hale related that he could walk about 30 feet before he experienced intermittent achiness in his left leg. (R. at 38, 87.) Dr. McIlwain opined that Hale was making good progress but that Hale needed to do more stretching and walking. (R. at 38.) Dr. McIlwain found Hale's weight to be an aggravating factor of his problem. (R. at 38.) Since Hale indicated that Soma did not help, Dr.

-8-

McIlwain gave Hale Flexeril and Oxycontin. (R. at 38, 87.)

On December 4, 2000, Hale visited Dr. Basa at Stone Mountain for a follow-up. (R. at 107.) Hale expressed concerns over his recent weight gain and his continued low back pain. (R. at 107.) Dr. Basa assessed Hale with chronic low back pain, gastroesophageal reflux disease, ("GERD"), hypothyroidism and weight gain. (R. at 107.) `

On January 4, 2001, Hale saw Dr. Basa at Stone Mountain for a follow-up appointment. (R. at 104.) Hale reported that he had stopped taking OxyContin because he did not think it helped his back pain. (R. at 105.) Dr. Basa diagnosed Hale with chronic low back pain, continued Hale's use of Synthroid, Prilosec and Vioxx and suggested Hale take Flexeril for his muscle spasms. (R. at 105.)

On February 19, 2001, Dr. McIlwain completed an Attending Physician's statement in support of Hale's claim for LTD benefits. (R. at 6-7.) Dr. McIlwain described the results of Hale's surgery as "fair"and indicated that he did not expect Hale to require future surgery. (R. at 6.) Dr. McIlwain further described Hale's status as "ambulatory" and his overall prognosis as "fair." (R. at 7.) Dr. McIlwain found Hale's level of impairment to be either class three, suggesting a moderate limitation of functional capacity where he would still be capable of light work, or class four, suggesting a marked limitation of functional capacity where he would be capable of sedentary work. (R. at 7.)

On February 26, 2001, Hale visited Appalachian Orthopaedic Associates with

reports that his back had begun to hurt again from his pelvis up to about his T12. (R. at 38.) Straight leg raises caused pain at the aponeurosis, as well as hamstring tightness. (R. at 38.) Dr. McIlwain suggested Hale do more range of motion exercises in physical therapy. (R. at 38.) Dr. McIlwain also injected both of Hale's aponeurosis trigger points with deep injections of Celestone and Marcaine. (R. at 38.)

On February 28, 2001, Dr. McIlwain confirmed that Hale could return to light duty subject to restrictions of four hours of work per day for two weeks, then a progression of two hours of work per day up to a total of eight hours per day. (R. at 40.) Dr. McIlwain further restricted Hale to no pulling or pushing of items weighing more than 10 pounds, no overhead work, no lifting of items weighing more than 10 pounds, only five percent bending or stooping and no carrying of items weighing more than 10 pounds and for no more than 10 to 20 feet. (R. at 40.) Dr. McIlwain stated that if light duty was not available, Hale was not able to work. (R. at 40.)

On April 2, 2001, Dr. McIlwain assessed Hale's physical capacities. (R. at 46.) Dr. McIlwain found that Hale could return to light duty with the following permanent restrictions: no pulling or pushing of items weighing more than 10 pounds, no overhead work, no lifting of items weighing more than 10 pounds and no carrying of items weighing over 20 pounds or carrying items for more than 10 to 20 feet. (R. at 46.) Dr. McIlwain found Hale's ability to stand at one to 30 percent and determined that Hale had no ability to use his feet for repetitive movement such as foot controls. (R. at 46.) Dr. McIlwain once again found that if light work was not available, Hale would be unable to work. (R. at 46.)

On April 4, 2001, Hale visited Dr. Basa at Stone Mountain for a follow-up with complaints of pain in his lower back. (R. at 103.) Hale denied any weakness or numbness of his lower extremities. (R. at 103.) Dr. Basa assessed Hale with chronic low back pain, hypothyroidism and GERD. (R. at 103.) Dr. Basa prescribed Lortab for Hale's low back pain and continued Hale's use of Flexaril and Vioxx. (R. at 103.)

On May 1, 2001, Hale visited Appalachian Orthopaedic Associates with reports that he was improving. (R. at 257.) Hale stated that he had received an epidural injection, which worked really well for two days but was no longer helpful. (R. at 257.) Dr. McIlwain gave Hale samples of Vioxx, Celebrex and Toradol. (R. at 258.)

On May 4, 2001, Hale returned to Stone Mountain for a follow-up appointment with Dr. Basa. (R. at 101.) According to Hale, his orthopedic surgeon had recommended another surgery on his back because the cage from his previous surgery was sitting on his degenerative disc, which could have been the cause of his persistent low back pain. (R. at 101.) Dr. Basa assessed Hale with chronic low back pain, continued Hale's use of Vioxx and Percocet and a thyroid supplementation and advised Hale to follow up with his orthopaedic surgeon. (R. at 101.)

On May 18, 2001, Hale had images taken of his lumbar spine at BRMC. (R. at 112.) The x-rays indicated post-surgical changes of L4-L5 with postoperative fibrotic changes and distortion of the thecal sac with artifact associated with fusion case devise. (R. at 112.) There also was mild disc bulging of L5-S1 and mild bulging of L3-L4 and some overall mild narrowing of the spinal canal. (R. at 112.)

-11-

On May 29, 2001, Hale returned to Appalachian Orthopaedic Associates. (R. at 258.) Hale reported discomfort while moving and stated that he experienced the most relief when he was on his side with his legs up and a pillow between his legs. (R. at 258.) Dr. McIlwain opined that the findings from the scan did not appear to be sufficiently significant to account for Hale's level of discomfort. (R. at 259.) Dr. McIlwain suggested rigorous hamstring stretching and gave Hale Celebrex and Percocet. (R. at. 259.)

On June 27, 2001, Hale had an appointment with Appalachian Orthopaedic Associates. (R. at 259.) Upon examination, Dr. McIlwain noted that Hale had a marked spasm in his lumbar spine. (R. at 259.) Dr. McIlwain gave Hale Baclofen for the spasm and advised that the only option outside of learning to deal with his pain was a discography at the L3-4 and a percutaneous disectomy if the discogram warranted and indicated such a need. (R. at 259.) As a result, a discogram and possible disectomy were scheduled. (R. at 260.)

Hale had x-rays taken at BRMC of his lumbar region on July 17, 2001, which revealed lateral projection that suggested that the contrast media was well-contained within the central aspect of the disc without extrusion into the prethecal space. (R. at 111.)

On August 7, 2001, Hale visited Bristol Orthopaedic Associates for soreness in his shoulders. (R. at 261-62.) Hale reported some discomfort in both of his shoulders at the AC joints and in the area of the subacromial region. (R. at 261.) Dr. McIlwain injected Hale's shoulders with Celestone and Marcaine with sterile prep

-12-

and technique. (R. at 261.) Hale also complained of back pain. (R. at 261.) Dr. McIlwain started Hale on Neurontin and changed Hale's use of Baclofen to Soma. (R. at 261.)

Upon a referral from Dr. McIlwain, Hale visited Dr. John M. Marshall, M.D., at Appalachian Rehabilitation Professionals for pain in his back and legs on August 23, 2001. (R. at 92-97.) Dr. Marshall assessed Hale with chronic low back and bilateral lower extremity pain with possible Ray cage fusion with a posterior inner body component. (R. at 93.) Dr. Marshall opined that there was probable original disc herniation and/or spinal stenosis and some hip/other orthopedic abnormalities. (R. at 93.) Dr. Marshall continued Hale's use of his current medication and recommended Hale take Titrate Neurontin up to the maximum dose. (R. at 93.) Dr. Marshall also suggested that Hale diet and exercise. (R. at 94.)

On August 28, 2002, upon a recommendation from Dr. Marshall, Hale saw Dr. McIlwain for an evaluation of the extruding cage noted on plain film. (R. at 263.) In determining whether there was nerve root compression, Dr. McIlwain noted that the cage had gone seven millimeters into the canal. (R. at 263.) However, the EMG conducted by Dr. Marshall indicated no nerve root irritation, so Dr. McIlwain opined that there probably was not nerve root impingement. (R. at 263.) Dr. McIlwain scheduled a lumbar myelogram CT to determine whether there was nerve root compression, injected Hale with Celestone, Marcaine and Xylocatine with sterile betadine prep and technique and gave Hale tramadol and Lortab. (R.at 263.)

On September 20, 2001, Dr. Marshall saw Hale and completed an Attending

-13-

Physician's Statement for Hale. (R. at 48-49, 95.) Dr. Marshall opined that Hale looked good and let his August 23, 2001, assessment stand. (R. at 95.) In his Attending Physician's Statement, Dr. Marshall described Hale's status as "unchanged" and indicated that Hale had reached his maximum medical improvement. (R. at 49.) Dr. Marshall also completed an Estimated Functional Capacities Evaluation of Hale but merely referred to Dr. McIlwain's permanent restrictions and did not give an independent analysis of Hale's restrictions. (R. at 50-51.)

On January 3, 2002, Hale had an appointment with Dr. Marshall where he reported that Fioricet did not help but that Percocet and Darvocet did ease his pain. (R. at 97.) Dr. Marshall made no new assessment but altered Hale's medication by recommending Darvocet instead of Percocet. (R. at 97.)

On March 4, 2002, Dr. Basa saw Hale for a follow-up exam. (R. at 224.) Hale reported that surgery had not alleviated his pain and he still experienced low back pain. (R. at 224.) Dr. Basa assessed Hale with chronic low back pain, GERD, hypothyroidism and allergic rhinitis. (R. at 224.)

Dr. Basa also completed an Attending Physician's Statement for Hale on March 4, 2002. (R. at 58-59.) Dr. Basa diagnosed Hale with chronic low back pain and found Hale to have lumbar paraspinal tenderness and muscle spasms. (R. at 58.) Dr. Basa found that Hale could not sit or stand for a long time or lift or bend. (R. at 58-59.) Dr. Basa described Hale's status as "retrogressed" and his level of physical impairment as class five, suggesting a severe limitation of functional capacity, which

-14-

would make him incapable of sedentary work. (R. at 59.) Dr. Basa further found that Hale had a class two mental/nervous impairment, meaning he had a slight limitation but would still be able to function in most stress situations and to engage in most interpersonal relationships. (R. at 59.) Dr. Basa also completed an Estimated Functional Capacities Evaluation. (R. at 60-61.) Dr. Basa found that Hale could only sit for only an hour a day with rest, stand for an hour a day with rest and walk for an hour a day with rest. (R. at 60.) Dr. Basa further found that Hale could never lift, carry, bend/stoop, squat, crawl, climb, reach above, crouch, kneel, balance, push/pull or drive an automobile because of his severe low back pain and ruptured disc. (R. at 60-61.) Dr. Basa determined that Hale could use his hands for simple grasping but not for pushing and pulling or fine manipulating. (R. at 61.) Dr. Basa also found that Hale could not use his feet for repetitive movements such as operating foot controls or use his hands and neck. (R. at 61.) Dr. Basa totally restricted Hale's ability to work at heights or exposed areas, be around machinery and drive automotive equipment and mildly limited Hale's activities involving exposure to dust, fumes and gases. (R. at 61.) Dr. Basa concluded that Hale could not work and gave an undetermined return-to-work date. (R. at 61.)

On March 14, 2002, Hale completed a LTD Claim questionnaire. (R. 66-70.) Hale explained that he could not perform the duties of his occupation or engage in any gainful employment because he had "back pain that radiate[d] down [his] legs, [and could not] bend over, walk or anything for any length of time. [He was also] very grouchy and irritable." (R. at 66.) Hale also indicated that he took Darvocet, Soma, Prilosec, Synthroid, Neurontin and Celebrex, some of which caused drowsiness, weight gain, grouchiness, moodiness and bowel irritability. (R. at 67.)

-15-

Hale further stated that he needed assistance doing things that required bending. (R. at 68.) Hale also explained that he had difficulties sleeping because of his back pain and leg numbness. (R. at 68.) Hale estimated that he drove 10 miles a day on average. (R. at 68.) When listing his recreational activities, Hale stated that he attended church services, played the guitar and enjoyed the computer. (R. at 69.)

Broadspire arranged for Marvin G. Payne, P.T., from Appalachian Rehab and Sports Medicine, to perform a Functional Evaluation on Hale, which was performed on May 14, 2002. (R. at 142-61.) The purpose of the evaluation was to determine Hale's functional abilities to return to any occupation. (R. at 142.) Payne concluded that Hale had the ability to perform medium level work above waist level for a two-hour workday and sedentary material handling below waist level due to poor motor control in this posture for an eight-hour workday. (R. at 142.) Payne further found that Hale would need to restrict sustained standing to 15 minutes and avoid forward bending, crouching and kneeling due to an inability to maintain those postures without external support from his arms. (R. at 142.)

At the request of Broadspire, William A. Hausch, a vocational field care manager, completed an Employability Assessment Report for Hale on July 22, 2002. (R. at 165-71.) The assessment was based on the results of the Functional Evaluation dated May 14, 2002, and on a telephonic vocational assessment interview with Hale. (R. at 167.) During the interview, Hale was friendly and cooperative and indicated a willingness to return to the work force. (R. at 167.) Hale also stated that he had average abilities in reading, writing, spelling and performing basic mathematics. (R. at 167.) Hale further stated that he did not believe that he could return to his former

-16-

occupation because he had pain in his lower back that radiated down his leg. (R. at 167.) Hale explained that his pain did not allow him to do anything for longer than four or five minutes before he had to change positions. (R. at 167.) Hale also cited the side effects of his medications, which included drowsiness, and his recent weight gain as reasons for his inability to return to his former occupation. (R. at 167.)

When describing his daily activities to the field care manager during the telephonic interview, Hale stated that he watched television, read and browsed the internet. (R. at 168.) Hale also indicated that he did laundry, helped his children with their homework and attended church services once a week. (R. at 168.) Hale notified the field care manager of his past work experience, which included jobs as a maintenance mechanic, general laborer, general maintenance repairman, trim carpenter, coal miner, block-making machine operator and fork-lift operator. (R. at 168-69.)

A transferable skills analysis was performed using the Dictionary of Occupational Titles, ("DOT"), and the Occupational Access System, ("OASYS"), to determine whether Hale was able to perform any job for which he was, or could have become, qualified based on his previous training, education and/or experience. (R. at 70.) To determine job matches, the DOT, The Classification of Jobs, the OASYS computer program and the United States Department of Labor, Bureau of Labor Statistics for Johnson City-Kingsport-Bristol, Tennessee, Virginia, were used. (R. at 170.) Per the requirements of Hale's disability plan, for jobs to be considered available to him, they must have paid at least $12.75 per hour or $26,520 per year, and have been within a 70-mile radius of Hale's home in Castlewood, Virginia. (R.

Case 1:04-cv-00053-GMW-PMS   Document 43   Filed 12/01/05   Page 17 of 25   Pageid#: 856

at 170.) The field care manager determined that there were jobs available to Hale that met the requirements of his disability plan including jobs as a production clerk, which paid $27,740 per year, a test-desk supervisor, which paid $39,440 per year, and an insurance claims and policy processing clerk, which paid $33,670 per year. (R. at 170-71.)

On July 15, 2002, BRMC took x-rays of Hale's lumbar spine and compared them with the images taken on May 18, 2001. (R. at 229-30.) There was no change in the configuration of the spine over the past 14 months, and there was continued seven millimeter extension of the L4-L5 intervertebral cage into the spinal canal with some left-sided predominance. (R. at 229.) Calcification of the ligamentum flavum was demonstrated at the L2-3 and L3-4, and the L3-4 continued to show mild annular bulging, which was not unexpected for the level immediately superior to a fusion. (R. at 230.)

On July 18, 2002, Hale visited Stone Mountain for a follow-up exam where he complained of continued low back pain, which radiated into his left leg. (R. at 228.) Dr. Basa noted motor weakness on Hale's left lower extremity. (R. at 228.) A CT scan of Hale's lumbar spine revealed seven millimeter extension of his intervertbral cage into the spinal canal with some left-sided predominance. (R. at 228.) Dr. Basa diagnosed Hale with chronic low back pain. (R. at 228.)

On July 29, 2002, Hale underwent labwork at Stone Mountain that revealed his cholesterol level was at 197 mg/dL, his triglycerides at 479 H mg/dL and his HDL cholesterol at 29 L mg/dL. (R. at 234.)

Case 1:04-cv-00053-GMW-PMS   Document 43   Filed 12/01/05   Page 18 of 25   Pageid#: 857

On October 28, 2002, Hale visited Stone Mountain for a follow-up, complaining of pain in his lower back. (R. at 273.) Hale related that he could not afford to undergo a CT myelogram because he had lost his insurance. (R. at 273.) Dr. Basa diagnosed Hale with chronic low back pain, GERD, hypothyroidism and allergic rhinitis. (R. at 273.) Dr. Basa also gave Hale sample of Protonix to replace his Prilosec for his GERD. (R. at 273.)

On January 13, 2003, Dr. Basa completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) for Hale. (R. at 276.) The assessment indicated that lifting/carrying were affected by Hale's impairment, for he could only lift items weighing less than 10 pounds maximum occasionally and items weighing less than 10-20 pounds maximum frequently due to his chronic low back pain (ruptured disc). Standing/walking also were affected as he could stand/walk for less than four hours a day and less than one hour a day without interruption because of his chronic low back pain. (R. at 276.)

## III. Analysis

### A. Standard of Review

The law governing claims for denial of benefits under ERISA is well-settled. In cases where the plan language grants the administrator discretion to determine eligibility for benefits, as it does in this case, the court may review the administrator's decision only for an abuse of discretion. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). Under this standard, the administrator's decision will not be

Case 1:04-cv-00053-GMW-PMS    Document 43    Filed 12/01/05    Page 19 of 25    Pageid#: 858

disturbed if it is reasonable, even if the court would have come to a different conclusion. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996). In this context, a decision is reasonable if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. Capital Care, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (citations omitted).

In the case at hand, the parties agree that the discretion given defendants by the Plan was sufficient to trigger the abuse of discretion standard. Hale argues, however, that the court should review defendants' actions using a modified abuse of discretion standard. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-13.) Where the plan administrator has a conflict of interest, namely, if the administrator processes and pays the claims from an insurer-funded plan in exchange for a premium from the employer, then the abuse of discretion standard must be modified to account for an accompanying potential for partisanship. *See Bedrick By & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996). Although Broadspire is the Plan Administrator in this case for initial determinations and first-level appeals, it does not insure AEP for payment of LTD benefits. (R. at 158, 332, 384-85.) In fact, the Plan explicitly states that the Plan is entirely funded by AEP. (R. at 332.) Where a claim administrator does not fund LTD benefits but merely administers the Plan, there is no conflict of interest. *See Williams v. UNUM Life Ins. Co. of Am.*, 250 F.Supp. 2d 641, 646 (E.D. Va. 2003). Moreover,

the final decision to award or deny benefits lies not with Broadspire but with the Appeal Committee, (R. at 395-96), and there is no evidence before the court that the Appeal Committee operated under a conflict of interest. Therefore, the court will review defendants' denial of Hale's claim for LTD benefits using the abuse of discretion standard.

### B. Substantial Evidence Supports Defendants' Decision

Hale argues that defendants' denial of his claim for disability constituted an abuse of discretion. (Plaintiff's Brief at 12-18.) As noted above, for Hale to prevail on this claim, he must show that defendants' decision was not supported by substantial evidence.

The Plan requires a claimant to be disabled from any occupation for which he is qualified by education, training or experience in order to receive LTD benefits beyond 26 weeks. (R. at 318, 378.) Having reviewed the records, the court finds that substantial evidence supports defendants' decision to deny Hale's request for a continuation of LTD benefits. Here, the records submitted to defendants were largely devoid of any objective evidence supporting Hale's assertion that he was disabled from any occupation. Most importantly, reports from Hale's own treating physicians confirm that he was not disabled from any occupation. Dr. McIlwain, Hale's orthopaedic surgeon, continually reported that Hale had improved since his back surgery and merely restricted Hale to light or sedentary work on February 19, 2001– despite Hale's absence of a right little finger. (R. at 7, 38.)   On February 28, 2001, and again on April 2, 2001, Dr. McIlwain confirmed that Hale was capable of light

duty subject to restrictions of no pulling or pushing of items weighing more than 10 pounds, no overhead work, no lifting of items weighing more than 10 pounds, only five percent bending or stooping and no carrying items of weighing more than 10 pounds and for no more than 10 to 20 feet. (R. at 40, 46.) On September 20, 2001, Dr. Marshall, another treating orthopedist, adopted Dr. McIlwain's finding that Hale was capable of light duty subject to the aforementioned restrictions (R. at 49-51.)

Although Dr. Basa, Hale's primary care physician, imposed significant restrictions on Hale in his March 4, 2002, Estimated Functional Capacities Evaluation, the court finds this assessment inconsistent with the substantial weight of the evidence (R. at 60-61.) For example, Dr. McIlwain noted on May 29, 2001, that x-rays of Hale's lumbar spine did not reveal objective findings that would account for Hale's level of discomfort. (R. at 259.) An EMG conducted on August 28, 2002, showed no nerve root irritation, which led Dr. Marshall to conclude that Hale probably had no nerve root impingement. (R. at 263.) Dr. Basa's limitations set forth in his Estimated Functional Capacities Evaluation are further inconsistent with his own Medical Assessment Of Ability To Do Work-Related Activities (Physical) dated January 13, 2003. (R. at 276.) In this assessment, Dr. Basa found that Hale could lift items weighing less than 10 pounds maximum occasionally and items weighing less than 10 to 20 pounds maximum frequently, although he concluded in the Estimated Functional Capacities Evaluation that Hale was incapable of sedentary work. (R. at 59, 276.) Moreover, Dr. Basa's assessment indicated that Hale could stand/walk for less than four hours a day, while the Estimated Functional Capacities Evaluation limited Hale's ability to walk to less than one hour. (R. at 59, 276.) Dr. Basa's Estimated Functional Capacities Evaluation also indicated that Hale

-22-

could not drive an automobile due to his severe low back pain and ruptured disc, despite Hale's admission in his LTD Claim Questionnaire dated March 14, 2002, that he drove an estimated 10 miles a day. (R. at 60-61, 68.) Hale further indicated in the questionnaire that he attended church services, played the guitar and browsed the internet. (R. at 69.) During his interview with a field care manager, Hale stated that he watched television, read, browsed the internet, attended church services, did laundry and helped his children with their homework. (R. at 168.) These daily activities are uncharacteristic of an individual who is disabled from working in any occupation. In rejecting Dr. Basa's Estimated Functional Capacities Evaluation, the court notes that it is not bound by the treating physician rule that is applicable in Social Security cases. *See Black & Decker Plan v. Nord,* 538 U.S. 822, 834 (2003).

As defendants emphasize, every independent medical professional concluded that Hale was not disabled from working in any occupation. (Defendants' Memorandum In Support Of Their Motion For Summary Judgment, ("Defendants' Brief"), at 40.) In particular, Dr. Rangaswamy found that Hale was not disabled, and Marvin G. Payne determined that Hale was capable of performing work at the medium level above waist level for a two-hour workday and sedentary material handling below waist level due to poor motor control in this posture for an eight-hour workday. (R. at 142, 281.) Based on Payne's evaluation and a telephonic interview with Hale, William A. Hausch determined that Hale could perform the duties of production clerk, test-desk supervisor and insurance claims and policy processing clerk. (R. at 167, 170-71.) Hale argues that the materials Hausch reviewed were insufficient, and Hale is incapable of performing the duties of the positions Hausch listed. (Plaintiff's Brief at 13, 17.) However, Hausch's conclusion finds additional

-23-

support in the opinions of Dr. McIlwain, Dr. Marshall and Dr. Rangaswamy – all of whom concluded that Hale was capable of light work. Even Hale admitted that he had average abilities in reading, writing, spelling and performing basic mathematics. (R. at 167.) Therefore, the court finds that substantial evidence supports the defendants' conclusion that Hale was not disabled from working in any occupation.

### C. Attorney's Fees

Finally, Hale argues that he is entitled to an award of attorney's fees. (Plaintiff's Brief at 21-22.) In ERISA cases, however, an award of attorney's fees may be granted only to the prevailing party. *See Martin v. Blue Cross & Blue Shield,* 115 F.3d 1201, 1210 (4th Cir. 1997). Because Hale is not entitled to summary judgment on any of his substantive claims, he is not a prevailing party and is not entitled to attorney's fees at this time.

### IV. Conclusion

Based on the above, I find that substantial evidence supports defendants' finding that Hale was not disabled. Therefore, I will overrule Hale's motion for summary judgment, sustain defendants' motion for summary judgment and affirm defendants' decision denying benefits.

Case 1:04-cv-00053-GMW-PMS   Document 43   Filed 12/01/05   Page 24 of 25   Pageid#: 863

An appropriate order will be entered.

DATED:        This _____ day December, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

-25-